**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

ENORAMA PHARMA INC. )
319 Clematis Street, Suite 209 )
West Palm Beach, FL 33401, )
 )
  Plaintiff, )
 )
v. ) Case No. <u>1:26-cv-00502</u>
 )
U.S. FOOD AND DRUG ADMINISTRATION; )
MARTIN A. MAKARY, M.D., Commissioner of )
Food and Drugs, 10903 New Hampshire Avenue, )
Silver Spring, MD 20903, )
 )
  and )
 )
U.S. DEPARTMENT OF HEALTH AND )
HUMAN SERVICES; ROBERT F. KENNEDY, )
JR., J.D., Secretary of Health and Human Services, )
200 Independence Avenue, SW, Washington )
DC 20201, )
 )
  Defendants. )

## VERIFIED COMPLAINT

Plaintiff Enorama Pharma Inc. files this Complaint against the United States Food and

Drug Administration ("FDA"), Martin A. Makary, M.D. (in his official capacity as the

Commissioner of Food and Drugs), the United States Department of Health and Human Services

("HHS"), and Robert F. Kennedy, Jr., J.D. (in his official capacity as Secretary of Health and

Human Services), and alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff is a small business that manufactures and distributes oral pouch products

which contain nicotine and food grade-quality ingredients. Plaintiff's products neither contain

tobacco nor involve combustion or inhalation of any chemicals. Through this action, Plaintiff seeks

a declaratory judgment that FDA violated the Regulatory Flexibility Act, 5 U.S.C. §§ 601, *et seq*., when, in 2021, the agency adopted a rule establishing the requirements for premarket applications for such products without engaging in the required regulatory flexibility analysis. Instead of conducting the required regulatory flexibility analysis, FDA arbitrarily and capriciously certified that the rule would not have a significant impact on a substantial number of small entities.

2.    FDA's failure to engage in the required regulatory flexibility analysis was arbitrary, capricious, and an abuse of discretion because, *inter alia*, when FDA adopted the rule specifying particular application requirements, the agency claimed that all associated compliance costs resulted not from that rule, but from a rule FDA had enacted five years before. But in its regulatory flexibility analysis for the earlier rule, FDA claimed it did not know how many manufacturers of novel nicotine products like Enorama would be affected, claimed that FDA could not estimate the costs of preparing applications for such products, and stated that "[w]ith respect to future rules, . . . we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established."

3.    Plaintiffs also seek a declaratory judgment that FDA violated the Administrative Procedure Act by (i) arbitrarily and capriciously adopting uniform clinical and non-clinical study and data requirements in the 2021 rule governing premarket applications for all statutorily defined "tobacco products" regardless of the level of potential health risk of the product; (ii) issuing a Refuse to File ("RTF") letter to Plaintiff Enorama that rejected Enorama's premarket applications for its nicotine pouches based on application requirements that FDA unlawfully, arbitrarily, and capriciously adopted through the 2021 rule; and (iii) applying the 2021 rule arbitrarily and capriciously.

4.    In addition to the declarations described above, Plaintiffs seek a judgment temporarily, preliminarily, and permanently enjoining FDA from applying the 2021 rule's requirements to premarket applications for nicotine pouches, temporarily and preliminarily staying FDA's RTF letter issued to Enorama, and setting aside and vacating the RTF letter.

### **THE PARTIES**

5.    Plaintiff Enorama Pharma Inc. ("Enorama") is a Delaware corporation with its principal place of business at 319 Clematis Street, Suite 209, West Palm Beach, Florida.  Enorama manufactures, markets, and sells oral nicotine pouches under its "NIC-S" brand as an alternative to cigarettes and smokeless tobacco products. Plaintiff employs fewer than 1,500 employees, qualifying it as a "small business" under the Regulatory Flexibility Act. *See* 5 U.S.C. § 601(3); 13 CFR 121.201 (setting the size standard for a tobacco manufacturer as 1,500 employees or fewer).

6.    Defendant United States Food and Drug Administration is an executive branch agency of the federal government and is headquartered at 10903 New Hampshire Avenue, Silver Spring, Maryland 20903.

7.    Defendant Martin A. Makary, M.D. (sued here only in his official capacity), is the Commissioner of Food and Drugs and an officer of the United States. His office is at 10903 New Hampshire Avenue, Silver Spring, MD 20903.

8.    Defendant United States Department of Health and Human Services ("HHS") is an executive branch agency of the federal government and is headquartered at 200 Independence Avenue, S.W., Washington, DC 20201.

9.    Defendant Robert F. Kennedy, Jr., J.D., (sued here only in his official capacity) is the Secretary of Health and Human Services and an officer of the United States. His office is at 200 Independence Avenue, S.W., Washington, DC 20201.

10.    FDA is an operating division of HHS. The Commissioner of Food and Drugs reports to the Secretary of Health and Human Services.

## JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1361. This Court has the authority to grant the declaratory relief requested by Plaintiffs pursuant to 28 U.S.C. §§ 2201 and 2202. The Court also has the authority to hold unlawful and set aside FDA's actions pursuant to 5 U.S.C. §§ 611(a), 702, and 706.

12.    This Court has personal jurisdiction over Defendants FDA, HHS, Commissioner Makary, and Secretary Kennedy in their official capacities, as each is an agency or official of the United States Government.

13.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1)(A) as the district wherein HHS resides.

## FACTS

**A.    The Parties Agree that Oral Nicotine Pouches Like Plaintiff's Present Far Fewer Health Risks than Traditional Tobacco Products.**

14.    The Centers for Disease Control, which is an operating agency of Defendant HHS, has explained that oral "[n]icotine pouches are small microfiber pouches that contain a powder made of nicotine, flavorings, and other ingredients. People typically put pouches between their lip and gum, where the nicotine is absorbed."[1]

15.    Unlike traditional tobacco products, and similar to other oral nicotine pouch products, Plaintiff's NIC-S oral nicotine pouches do not contain any tobacco leaf or other tobacco plant material. Instead, in addition to pharma (USP) grade nicotine, they contain other inactive and

---

[1] *See* https://www.cdc.gov/tobacco/nicotine-pouches/index.html (Jan. 2025).

non-addictive ingredients that are generally recognized by FDA as safe when used as food additives. Indeed, under the laws of Sweden, where the products are manufactured under contract, Plaintiff is required to use food-grade ingredients in its products.

16.    Also, unlike traditional tobacco products, use of Plaintiff's NIC-S oral nicotine pouches does not involve any combustion or inhalation of any chemicals. Instead, when the user places the pouch in his or her mouth, the nicotine contained in the pouch is absorbed over time into the user's bloodstream through the buccal membranes.

17.    As a result, oral nicotine pouches as a category, including Plaintiff's NIC-S nicotine pouches, are far less harmful than traditional tobacco products, including those involving combustion and direct and secondhand inhalation of smoke, such as combustible cigarettes, and smokeless tobacco products, which FDA has stated may contain 4,000 chemicals, including as many as 30 chemicals linked to oral and other cancers.[2]

18.    For years, FDA has recognized that different tobacco and nicotine-containing products present varying levels of health risks, with combusted tobacco products, such as cigarettes, most harmful to health and non-combusted products posing lower health risks.

19.    For example, in a 2017 speech, the FDA Commissioner observed that "it's cigarettes that are the primary cause of tobacco-related disease and death" but that "the nicotine in cigarettes is not directly responsible for the cancer, lung disease, and heart disease that kill hundreds of thousands of Americans each year. . . . [Rather,] it's the other chemical compounds in

---

[2] FDA, Smokeless Tobacco Products, Including Dip, Snuff, Snus, and Chewing Tobacco (June 7, 2023), https://www.fda.gov/tobacco-products/products-ingredients-components/smokeless-tobacco-products-including-dip-snuff-snus-and-chewing-tobacco.

tobacco, and in the smoke created by setting tobacco on fire, that directly and primarily cause the illness and death, not the nicotine."[3]

20.     While nicotine is addictive, nicotine itself does ***not*** cause cancer. FDA's website emphasizes that it is the "toxic mix of chemicals [in tobacco smoke]—***not nicotine***—[that] causes serious health effects among those who use tobacco products, including fatal lung diseases, like chronic obstructive pulmonary disease (COPD) and cancer."[4]

21.     FDA thus recognizes that oral nicotine pouches are generally a lower-risk alternative for cigarette smokers.[5] Indeed, as recently as September 2025, FDA acknowledged that "nicotine pouches can help some adults switch away from more harmful tobacco products, and adults who significantly reduce their cigarette use or fully switch from smoking cigarettes to using a lower-risk alternative tobacco product could generally reduce their health risks and exposure to toxic and cancer-causing chemicals."[6]

---

[3] FDA Commissioner Scott Gottlieb, *Protecting American Families: Comprehensive Approach to Nicotine and Tobacco* (June 28, 2017), available at: https://tinyurl.com/4zjcmvjb (last visited June 6, 2024).

[4] FDA, Nicotine Is Why Tobacco Products Are Addictive (July 7, 2025), https://www.fda.gov/tobacco-products/health-effects-tobacco-use/nicotine-why-tobacco-products-are-addictive#2 (emphasis added).

[5] FDA, The Relative Risks of Tobacco Products (Dec. 19, 2025), https://www.fda.gov/tobacco-products/health-effects-tobacco-use/relative-risks-tobacco-products.

[6] FDA, FDA Launches Program to More Efficiently Review Nicotine Pouch Applications (Sept. 18, 2025), https://www.fda.gov/tobacco-products/ctp-newsroom/fda-launches-program-more-efficiently-review-nicotine-pouch-applications.

**B.     In its Analysis of a Rule "Deeming" Novel Tobacco Products to be Subject to the Tobacco Control Act's Premarket Authorization Requirements, FDA Emphasized that It Could Not Quantify the Costs Associated with Future Rulemakings Specifying the Contents of Premarket Tobacco Applications.**

22.     In 2009, Congress granted FDA regulatory authority over tobacco products for the first time by amending the Federal Food, Drug, and Cosmetic Act ("FDCA") through the Family Smoking Prevention and Tobacco Control Act, Pub. L. 111-31, 123 Stat. 1776 (2009) ("TCA" or "Act").

23.     When granting FDA jurisdiction over tobacco products, Congress made clear that its underlying purpose and intent was to reduce the morbidity (disease) and mortality (death) that results from smoking and the use of other traditional tobacco products.

24.     For example, in its findings, Congress concluded that combustible cigarettes "cause cancer, heart disease, and other serious adverse health effects"; are "the foremost preventable cause of premature death in America"; cause "over 400,000 deaths in the United States each year,"; and that "approximately 8,600,000 Americans have chronic illness relating to smoking." TCA, §§ 2(2), (13), 123 Stat. 1776, 1777.

25.     Congress also found that a 50 percent "reduction in youth smoking" would save "over 3,000,000" minors "from premature death due to tobacco-related disease" and "would also result in approximately $75,000,000,000 in savings attributable to reduced health care costs." TCA, § 2(14), 123 Stat. 1776, 1777.

26.     Congress also stated that one of its purposes in enacting the TCA was to "provide new and flexible enforcement authority" to FDA "to ensure that there is effective oversight of the tobacco industry's efforts to develop, introduce, and promote less harmful tobacco products." TCA § 3(4), 123 Stat. 1776, 172.

27.    The TCA's requirements originally extended only to "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco."[7] 21 U.S.C. § 387a(b). However, Congress allowed FDA to extend by rule the TCA's requirements to "any other tobacco products that the Secretary by regulation deems" to fall under the Act. *Id.*

28.    In 2016, FDA first extended the TCA's requirements to novel nicotine products when it "deemed" products containing nicotine derived from tobacco to be "tobacco products" under the Act. *See* 81 Fed. Reg. 28974 (May 10, 2016) (the "Deeming Rule") (adopting, *inter alia*, 21 C.F.R. § 1100.1).

29.    Then, in March 2022, Congress enacted legislation expanding the TCA's definition of "tobacco product" to include products "containing nicotine from any source," even if that source was not the tobacco plant, effective April 14, 2022. *See* Pub. L. 117-103, § 111(a)(1); 21 U.S.C. § 321(rr)(1).

30.    Under section 910 of the TCA, anyone wishing to market a "new tobacco product" in interstate commerce must file a premarket tobacco product application ("PMTA") with FDA and receive a marketing granted order from the agency. *See* 21 U.S.C. § 387j.

31.    A "new tobacco product" is one "that was not commercially marketed in the United States as of February 15, 2007." 21 U.S.C. § 387j(a)(1)(A).

32.    Section 910 of the Act requires FDA to issue a marketing granted order if the PMTA demonstrates, among other things, that permitting marketing of the new tobacco product "would be appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2)(A).

---

[7] The TCA defines "smokeless tobacco" as "any tobacco product that consists of cut, ground, powdered, or leaf tobacco and that is intended to be placed in the oral or nasal cavity." 21 U.S.C. § 387(18).

33.    While the TCA sets out certain categories of information that a PMTA must contain, 21 U.S.C. § 387k(b), it does not elaborate as to the requirements or specific information necessary to satisfy the PMTA requirements.

34.    Instead, the Act provides that whether an applicant has shown that a marketing granted order for a tobacco product would be "appropriate for the protection of the public health," 21 U.S.C. § 387j(c)(2)(A), "shall, when appropriate, be determined on the basis of well-controlled investigations, which may include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product." 21 U.S.C. § 387j(c)(5)(A).

35.    However, the TCA also provides that, if FDA "determines that there exists valid scientific evidence (other than evidence derived from investigations described in subparagraph (A)) which is sufficient to evaluate the tobacco product," the FDA may grant a marketing order based on such other evidence. 21 U.S.C. § 387j(c)(5)(B).

36.    At the time FDA issued the Deeming Rule in 2016, the agency had not yet begun to develop the regulations governing PMTAs, including regulations specifying the types of "investigations," or studies, required of applicants, including clinical studies involving human subjects.

37.    Nevertheless, as required by the Regulatory Flexibility Act, 5 U.S.C. § 604, FDA issued a Final Regulatory Impact and Regulatory Flexibility Act analysis ("Deeming Rule RIA") in conjunction with the Deeming Rule.[8]

38.    In its Deeming Rule RIA, FDA repeatedly stressed that "research burdens of PMTAs are quite different from premarket applications for new drugs. For example, FDA does

---

[8] Available at https://www.regulations.gov/document/FDA-2019-N-2854-0125.

not expect that PMTAs will include randomized clinical trials like those conducted to support drug approvals." Deeming Rule RIA at 86, 150.

39.    In response to public comments that argued that "based on the types of studies that FDA would require . . . the cost of a PMTA could be millions of dollars per product," FDA stated, "We disagree." Deeming Rule RIA at 37. In its discussion of potential "Human Studies," FDA suggested that it anticipated that applicants would be able to rely on publicly available information or studies that FDA itself was conducting at the time—not that multi-million dollar studies of the applicants' individual products would be required. *Id.* at 149-50.

40.    The Deeming Rule RIA did not include any specific estimates for the costs of preparing PMTAs for novel nicotine products other than electronic nicotine delivery system ("ENDS") products and e-liquids for use in them.

41.    Rather, even though FDA noted that the Deeming Rule would extend the TCA's requirements, including the premarket authorization requirement, to "tobacco products that do not fit into traditional product categories, such as ENDS and nicotine gels," FDA stated that it was unable to quantify the "costs for novel tobacco products other than ENDS due to lack of data." Deeming Rule RIA at 75. FDA further stated that it could not even estimate the number of manufacturers and importers of such novel products that would be affected by the Deeming Rule. *Id*. at 69.

42.    In response to comments criticizing FDA for failing to accurately quantify the costs of the Deeming Rule, including the costs of preparing PMTAs, FDA stated: "With respect to future rules, . . . we cannot predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established." Deeming Rule RIA at 53-54.

**C.    When FDA Later Published a Rule Specifying the Contents of Premarket Tobacco Applications, the Agency Claimed It had Already Accounted for the Costs of Compliance in the Deeming Rule Even Though the New Rule Piled on Substantial Additional Investigation Costs.**

43.    More than three years later, on September 25, 2019, FDA published its proposed rule regarding the agency's requirements for the contents of PMTAs for all tobacco products, including "deemed" tobacco products. Premarket Tobacco Product Applications and Record Keeping Requirements, Proposed Rule, 84 Fed. Reg. 50566 ("Proposed PMTA Rule").

44.    The Proposed PMTA Rule, the text of which alone took up fully 24 pages of the *Federal Register*, set forth the required content and format of PMTAs.  *See* 21 C.F.R. § 1114.7.

45.    In conjunction with the Proposed PMTA Rule, FDA published a preliminary impact analysis and initial regulatory flexibility analysis ("PMTA Rule Preliminary RIA").[9]

46.    In its PMTA Rule Preliminary RIA, FDA proposed to certify pursuant to 5 U.S.C. § 605(b) that the PMTA Rule "would not have a significant economic impact on a substantial number of small entities." PMTA Rule Preliminary RIA at 6.

47.    FDA reasoned that it had "already included the costs to submit and review PMTAs for deemed tobacco products in the final regulatory impact analysis for the Deeming Rule" in 2016, PMTA Rule Preliminary RIA at 7, and that the earlier analysis "accounted for the costs to comply with the format and content requirements of a PMTA as described in the TCA," *id*. at 22.

48.    Some 598 comments were filed with FDA by stakeholders in response to the Proposed PMTA Rule.

49.    In response to the PMTA Rule Preliminary RIA, the Small Business Administration's ("SBA") Office of Advocacy filed comments. In those comments, SBA objected

---

[9] Available at https://www.fda.gov/media/130833/download?attachment.

to FDA's proposed certification that the PMTA Rule would not have a significant impact on a substantial number of small entities, writing that the certification "improperly assumes that the compliance costs of the proposed rule's requirements for deemed products are due to the agency's 2016 rule," rather than to the Final PMTA Rule, which explained FDA's interpretation and implementation of the statutory requirements.

50.    Despite SBA's Office of Advocacy's objection, FDA published the final PMTA Rule on October 5, 2021, months before Enorama's products were brought under the FDA's jurisdiction. 86 Fed. Reg. 55300 ("Final PMTA Rule").

51.    FDA published its final Regulatory Impact Analysis and Regulatory Flexibility Act Analysis ("Final PMTA Rule RIA") on the same date.[10]

52.    In its Final PMTA Rule RIA, FDA certified that the Final PMTA Rule would generate net benefits or negligible net costs for most affected small entities. FDA thus certified that the Final PMTA Rule would not have a significant economic impact on a substantial number of small entities. Final PMTA Rule RIA at 7, 41.

53.    In response to comments asserting that FDA had failed to account for many of the costs to prepare and submit PMTAs for deemed tobacco products, FDA stated: "We attribute any costs that result from the requirement to prepare and submit PMTAs for deemed new tobacco products to the Deeming Final Rule and not this rule. We therefore consider most aspects of these comments out-of-scope." Final PMTA Rule RIA at 12.

54.    Likewise, in response to comments, like those submitted by the SBA, that suggested that FDA improperly proposed to certify that the PMTA rule would not have a significant impact on a substantial number of small entities, FDA stated: "We disagree with this comment. We believe

---

[10] Available at https://www.fda.gov/media/152622/download.

that this comment conflates the impacts of the Deeming Rule with the impacts of this final rule."
Final PMTA Rule RIA at 13.

55.     Because FDA certified that the PMTA rule would not have a significant impact on
a substantial number of small entities, the agency rejected the suggestion that it needed to prepare
a full regulatory flexibility analysis. Final PMTA Rule RIA at 42. As a result, FDA did not consider
potential alternatives or modifications to the Proposed PMTA Rule to lessen the burden of its
requirements on small entities while still satisfying the TCA's statutory requirements as would
otherwise be required by 5 U.S.C. § 604(a)(6).

56.     FDA reached its conclusions that the Final PMTA Rule would generate net benefits
or negligible net costs for most affected small businesses even though, through its interpretation
of the types of "investigations" that *all* applicants for premarket authorization would need to
provide, FDA piled on substantial additional costs to generate and submit a complete PMTA.

57.     Thus, by way of example, in 21 C.F.R. § 1114.7(k), FDA required applicants for
*all* types of tobacco products, regardless of whether such products contained any harmful or
potentially harmful constituents besides nicotine, to submit, *inter alia*:

> a.     study reports regarding the health effects of the constituents, including
> harmful and potentially harmful constituents, "at the quantitative levels delivered to both
> users and nonusers under the range of conditions under which the product might be used,"
> 21 C.F.R. § 1114.7(k)(1)(i)(A);

> b.     study reports regarding the "genotoxicity, carcinogenicity, reproductive
> toxicity, immunotoxicity, acute toxicity, and repeat dose (chronic) toxicity" of the product
> both standing alone and relative to other tobacco products, including "studies which discuss

the toxicological effects of any leachables and extractables that can appear from the container closure system and the ingredient mixture," 21 C.F.R. § 1114.7(k)(1)(i)(B);

     c.     study reports regarding the "pharmacological profile" of the product, "including pharmacokinetics, pharmacodynamics, metabolism, and elimination profile" of "*any* of the ingredients, additives, and [harmful and potentially harmful constituents]" both standing alone and relative to other tobacco products," 21 C.F.R. § 1114.7(k)(1)(i)(C) (emphasis added);

     d.     study reports addressing "[h]ow users actually use the product, including use topography, product use frequency, [and] use trends over time," 21 C.F.R. § 1114.7(k)(1)(ii)(B);

     e.     study reports on the likelihood that users of other tobacco products will (i) start using the product; (ii) use the product in conjunction with other tobacco products; (iii) switch or switch back to using other, more harmful tobacco product after starting use of the product; and (iv) use the product when they might have otherwise quit using all tobacco products, 21 C.F.R. § 1114.7(k)(1)(ii)(C)-(F);

     f.     study reports on the likelihood that non-users of tobacco products will initiate use of the product, as well as switch to other, more harmful, tobacco products, 21 C.F.R. § 1114.7(k)(1)(ii)(A)-(B);

     g.     study reports on the likelihood that former users of tobacco products will re-initiate use with the subject product, 21 C.F.R. § 1114.7(k)(1)(iii)(C); and

     h.     the impact of the product and its labeling and advertising on consumer perception, use intentions, and ability to use the product in accordance with instructions, 21 C.F.R. § 1114.7(k)(1)(iv)(A)-(C).

58.     Contrary to FDA's suggestions in the "Human Studies" section of its Deeming Rule RIA that applicants would be able to rely heavily on publicly available information or studies that FDA itself was conducting, for novel products like oral nicotine pouches, each of the above-referenced categories requires either significant non-clinical testing and/or clinical studies involving human subjects with at least some number of the applicant's own, unique products.

59.     Further, despite FDA's repeatedly stating in its Deeming Rule RIA that the agency did not expect that randomized clinical trials would be required for most tobacco products, in reality, to authorize a tobacco product through the PMTA pathway, FDA has typically required a longitudinal switching or cessation study, such as a randomized controlled trial, in which the applicant's specific product is used. Depending on study design and duration, these studies alone typically cost between $1,000,000 and $6,000,000 or more. FDA does not provide pass/fail criteria for such clinical studies; thus, even if an applicant devotes extensive time and resources to such a study, it does not know whether it will meet FDA's standards.

60.     Depending on the product's complexity and the extent of clinical (i.e., human subject) evidence included, a bundled PMTA for an oral nicotine pouch product that satisfies all of FDA's "investigation" demands set forth in the Final PMTA Rule will typically cost between $3 million and over $15 million.

61.     This actual cost range is a far cry from the estimate FDA provided in its Deeming Rule RIA for e-liquid products for use in electronic nicotine delivery systems, or e-cigarettes (which themselves are significantly more complex than oral nicotine pouch products because they involve heating, aerosolization, and inhalation). In its Deeming Rule RIA, FDA estimated the cost of preparing a complete bundled PMTA for these products to be between $181,686 and $2,014,120, with an average cost per SKU of $131,643. Deeming Rule RIA at 87.

62. The vast disparity between the costs FDA estimated in its Deeming Rule RIA for e-liquids for use in e-cigarettes and the actual costs to prepare a complete PMTA for a far less complex product, oral nicotine pouch products, is the result of the significantly more onerous "investigation" demands that FDA imposed through the Final PMTA Rule.

63. Indeed, FDA's demands set forth in both the Proposed and Final PMTA Rule caused many manufacturers of novel nicotine products that had originally intended to or did, in fact, submit PMTAs that failed to satisfy FDA's "investigation" requirements to close their doors and withdraw from the market completely.

**D.    Enorama Timely Submits PMTAs for its Oral Nicotine Pouch Products in 2022.**

64. As noted above, effective April 14, 2022, Congress broadened the TCA's definition of "tobacco product" to include products "containing nicotine from any source." Pub. L. 117-103, § 111(a)(1); 21 U.S.C. § 321(rr)(1).

65. The same legislation required that, for products containing non-tobacco nicotine that were already commercially marketed to remain on the market, applications for such products had to be submitted to FDA by May 14, 2022. *See* Pub. L. 117–103, §111(d).

66. Because Enorama's oral nicotine pouch products were not commercially marketed as of February 15, 2007, they are considered a "new tobacco product" under section 910 of the TCA.

67. Enorama launched its NIC-S pouch products in the United States before April 15, 2022.

68.     On May 12, 2022, Enorama submitted bundled PMTAs for eighteen of its NIC-S pouch products containing synthetic nicotine.[11] Enorama submitted various amendments to the PMTAs between July 15, 2022, and December 16, 2025.

69.     As noted above, the NIC-S pouch products contain high-quality, food-grade ingredients sourced from industry standard suppliers and pharmaceutical (USP) grade nicotine. In this respect, the NIC-S pouches are not materially different from nicotine pouch products sold by major tobacco companies that obtained FDA marketing granted orders in 2025, including Philip Morris International's ZYN and Altria Group's on! PLUS.

70.     Because Enorama submitted its PMTAs by May 14, 2022 (one month after the TCA was amended to cover non-tobacco nicotine pouch products), Enorama's pouch products were not immediately subject to an FDA enforcement action. *See* Pub. L. 117-103, § 111(d).

71.     On January 4, 2023, Enorama received a letter from FDA noting the agency's acceptance of Enorama's bundled PMTAs.

**E.     FDAs Process for Reviewing PMTAs**

72.     In its Final PMTA Rule, FDA provided for three stages of review of premarket applications:

        a.     <u>Acceptance review</u>. When an applicant submits a PMTA to FDA, the agency conducts an initial review "to determine whether the PMTA may be accepted for further review." 21 C.F.R. § 1114.27(a). FDA must "accept" a PMTA for further review if the application complies with the content and format requirements found in 21 C.F.R. §§ 1105.10 and 1114.7. *See* 21 C.F.R. § 1114.27(a). If FDA does not "accept" a PMTA, it

---

[11] A "bundled" PMTA is "a single premarket submission for multiple products." 86 Fed. Reg. 55300, 55317.

will issue a "Refuse to Accept" Letter and "close" the application. 21 C.F.R. §§ 1114.27(a), 1114.29(a), (b).

b. <u>Filing review</u>. If FDA "accepts" a PMTA, it then makes "a threshold determination of whether the application contains sufficient information to permit a substantive review" (also called "application review"). 21 C.F.R. § 1114.27(b). If the PMTA contains sufficient information for "substantive review," FDA "files" the application. 21 C.F.R. § 1114.27(b)(2).

c. <u>Substantive review</u>. If FDA "files" the PMTA, it will then conduct a "substantive review" of the application and "act on the application" within 180 days of the date of filing. 21 C.F.R. § 1114.27(c)(1)-(2).

## F.    FDA's Exercise of Enforcement Discretion for New Tobacco Products with Timely-Filed PMTAs Undergoing any Stage of Review

73.    The distribution of an FDA-regulated product without the required FDA marketing authorization may result in an FDA "enforcement action."

74.    FDA enforcement actions with respect to tobacco products include, among other things:

a.    administrative civil money penalty proceedings that may result in penalties of up to $21,903 for each violation, not to exceed $1,460,195 for all violations adjudicated in a single proceeding, *see* 21 U.S.C. § 333(f)(9)(A); 21 C.F.R. § 17.2; 45 C.F.R. § 102.3;

b.    injunction proceedings that may result in a permanent injunction prohibiting the defendant from marketing its products, *see* 21 U.S.C. § 332(a);

c.    the seizure and destruction of the subject products, *see* 21 U.S.C. § 334(a); and/or

- 18 -

d.      a criminal prosecution that could result in one year in prison and/or a fine of $1,000, *see* 21 U.S.C. § 333(a)(1).

75.      However, FDA often exercises "enforcement discretion"—*i.e.*, refrains from bringing an enforcement action—for products that do not have FDA marketing authorization.

76.      Because many non-tobacco nicotine pouch products were legally on the market before they became subject to the TCA in 2022, FDA's practice has been to exercise enforcement discretion for non-tobacco nicotine pouch products with timely-filed PMTAs so long as those PMTAs are undergoing any stage of FDA review (be it acceptance review, filing review, or substantive review).

77.      Thus, for instance, FDA never took enforcement action regarding Philip Morris' ZYN product or Altria Group's on! PLUS product even though Philip Morris and Altria Group marketed the products before FDA authorized the products.

78.      Multiple other brands of oral nicotine pouch products that are the subject of pending PMTAs, including both products containing tobacco-derived nicotine and those containing non-tobacco nicotine, continue to be commercially marketed by their manufacturers without enforcement action by FDA.

79.      Indeed, on information and belief, FDA has never initiated an enforcement action charging a respondent/defendant with selling an unauthorized nicotine pouch product where that product was the subject of a timely-filed PMTA still undergoing any stage of FDA review.

**G.      FDA Wrongly Refuses to File Plaintiff's PMTAs for Substantive Review.**

80.      On January 30, 2026, FDA issued a Refuse to File letter for Enorama's PMTAs. Before Enorama received the RTF letter, Enorama has not received any communication from the FDA on its PMTAs since the acceptance letter in January 2023.





### 1. FDA fails to follow the PMTA Rule.

82.    FDA's filing review of a PMTA is intended to determine whether the application contains sufficient information to permit a full substantive review. The PMTA Rule provides that FDA may refuse to file a PMTA if "[t]he application does not contain *any substantive information*, including information from published literature *or bridged from an investigation of another tobacco product*, regarding …[t]he abuse liability of the new tobacco product."   21 C.F.R. § 1114.27(b)(ii)(C) (emphases added).

83.    FDA has clarified that "a PMTA must contain *at least some amount of substantive information* regarding each of the topic areas in § 1114.27(b)(1)(ii) to be filed for substantive review." 86 Fed. Reg. at 55357 (emphasis added).

84.    Filing review requires only that the application contain substantive information regarding certain specified broad categories of information that must be addressed in every PMTA for FDA to determine whether permitting the marketing of the new tobacco product would be appropriate for the protection of public health (APPH).  FDA considers substantive information to be "information that is relevant to the subject it claims to support and has evidentiary support."  86 Fed. Reg. at 55369.

85.    As FDA stated: "Refusing to file PMTAs that *contain no information regarding these broad categories of information* allows FDA to efficiently enforce the premarket review requirements of [21 U.S.C. § 387j] by avoiding the significant expenditure of resources it would otherwise commit to the substantive review of applications that clearly lack sufficient information to receive a marketing granted order." 86 Fed. Reg. at 55380.

86.    21 C.F.R. § 1114.27(b)(1)(ii) requires a PMTA to contain at least some amount of substantive information regarding the abuse liability of the new tobacco product.  FDA has explained the difference between filing review and substantive review as follows:

> Filing review is a limited examination to determine whether the technical elements of the application contain the information required by § 1114.7 (or other section as applicable), which FDA considers "sufficient information" at that time that would allow FDA to determine whether the application demonstrates the marketing of the product would be APPH. The "sufficient information" necessary to receive a marketing granted order is information that does, in fact, demonstrate the marketing of the product would be APPH and the PMTA meets the other requirements of [21 U.S.C. § 387j].

86 Fed. Reg. at 55381.





REDACTED

93.     FDA has explicitly acknowledged that bridging pharmacokinetic data from another product to an applicant's new products is acceptable, even at the scientific review stage, which is substantially more demanding than the current context of filing review.  Here, FDA has suggested that the applicant should consider that the pharmacokinetics of a new product may be influenced by a combination of product characteristics, including, but not limited to, nicotine concentration, nicotine formulation, characterizing flavor, product category and subcategory, pH, and other product design parameters, ingredients, and characteristics.

94.    However, in its previous authorizations of nicotine pouch products, FDA has provided substantial flexibility with bridging approaches, even at the scientific review stage.  For instance, in the ZYN authorization, FDA stated:

> The applicant did not provide clinical or observational data for the 6 mg Menthol new product and the BCP review concluded that the abuse liability of the 6 mg Menthol new product cannot be bridged to other new products with a known abuse liability profile because the applicant did not provide sufficient data and bridging rationale.  However, the TPL found that, given the similarities in nicotine content and multisensory subjective effects (i.e., cooling sensation, mint-like flavor) between these products, it does not expect that the non-nicotine factors influencing abuse liability of the 6 mg Menthol product are different enough from the other 6 mg new products to differentially affect abuse liability. In addition, even if the abuse liability of the 6 mg Menthol product is similar to the abuse liability of moist snuff, the TPL determined that authorizing the 6 mg Menthol new product would still result in a reduction in overall health risks to current moist snuff users who switch completely to the new products.

ZYN Technical Project Lead ("TPL") Review at 3.3.1.1.

95.    Likewise, in the on! PLUS authorization, FDA stated: "The PK study did not test all of the new products but tested each nicotine level (6 and 9 mg) and characterizing flavor.  A previous generation of the mint 9 mg was tested and FDA found the bridging approach acceptable because of similar measures of total and free nicotine levels."  Moreover, FDA authorized the on! PLUS products despite concluding that: "Microbiology found the bridging approach inadequate because (1) the methods were designed and validated for use in foods not tobacco products and (2) the applicant did not provide product composition information for the products used in the bridged study." *See* on! PLUS TPL Review at 3.1.2.

96.    Thus, in both of these authorizations, FDA allowed bridging during substantive scientific review even when it explicitly acknowledged deficiencies in the bridging rationale.

REDACTED

REDACTED



REDACTED

101.    Importantly, in the on! PLUS TPL Review, FDA specifically concluded: "BCP also found the applicant's bridging approach between the tested new products (on! GEN 1 Mint 9 mg, PM0009121.PD14, PM0009121.PD16, and PM0009121.PD17) and the untested new products (PM0009121.PD10, PM0009121.PD11, PM0009121.PD13) to be acceptable because of similar measured total and free nicotine levels."  Moreover, FDA stated:

> To bridge a tested product to an untested product, BCP requires that the products be sufficiently similar in the product characteristics that influence abuse liability. For nicotine pouches, *BCP's primary bridging criteria include total and free nicotine content* because nicotine content in tobacco products affects users' exposure to nicotine and pH moderates nicotine exposure by allowing free nicotine to more readily cross biological membranes, including oral mucosa (e.g., Chen et al., 1999; Nair et al., 1997; Nielsen et al., 2002; Wilhelm et al., 2022).

on! PLUS TPL Review at 3.2.3 (emphasis added).

102.    Under the Administrative Procedure Act, FDA is required to treat similarly situated parties or products equally.  *See, e.g., Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27–28 (D.D.C. 1997).  In the reviews of the ZYN and on! PLUS pouch products, FDA gave the applicants numerous opportunities to amend their applications, requesting basic items like product characterization data and method validation data.  Most significantly, however, even though FDA found that both applicants did not provide adequate bridging rationales, FDA not only filed those applications, but also issued marketing granted orders for the products.

REDACTED



REDACTED

## COUNT I
### Regulatory Flexibility Act

109.    Plaintiff repeats each of the preceding paragraphs as if fully set forth herein.

110.    The Regulatory Flexibility Act requires federal agencies to follow certain procedures to consider and minimize the impact of a proposed rule that would affect a substantial number of small entities, including analysis of potential alternatives to the regulation that would satisfy the statutory requirements without imposing unnecessary burdens on small businesses. 5 U.S.C. §§ 603(a)-(c), 604(a).

111.    An agency can avoid this requirement "if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). When an agency makes such a certification, the agency is required to also publish a statement providing the factual basis for the certification. *Id.*

112.    An agency's improper certification is subject to judicial review under the Administrative Procedure Act's "arbitrary and capricious" standard. 5 U.S.C. § 611(a); *North Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650, 658 (E.D. Va. 1998).

113.    A court may find a certification to be improper where, even though there is a "statement," the statement does not provide a factual basis, or explanation, for why the rule at issue will not have a significant economic impact on a substantial number of small entities. *North Carolina Fisheries Ass'n*, 16 F. Supp. 2d at 652.

114.    In FDA's Deeming Rule RIA, the agency explicitly acknowledged that it lacked data on the number of manufacturers and importers of novel nicotine products other than ENDS and stated that it could not quantify the costs of the Deeming Rule (which include the costs of PMTA preparation) for such products due to a lack of data. Deeming Rule RIA at 69, 75.

115.    Further, FDA had not yet even begun the process of developing the regulations governing PMTAs that would define the "investigations" required of applicants. FDA thus noted that it could not "predict the costs or benefits of future rulemaking before the contents of the rules themselves have been established." Deeming Rule RIA at 53-54.

116.    Nevertheless, in the Deeming Rule RIA, FDA minimized the need for expensive clinical studies and repeatedly suggested that randomized controlled trials would likely be unnecessary for most newly deemed products.

117.    However, five years later, when FDA finalized the PMTA Rule, the agency imposed requirements for multiple costly clinical studies, including randomized controlled trials or their equivalents (i.e., longitudinal studies that followed user switching behavior over time), for *all* new tobacco products, regardless of their overall risk profile in terms of morbidity and mortality.

118.    And, despite the fact that FDA had previously acknowledged that it could quantify neither the number of manufacturers of novel nicotine products other than ENDS nor the costs the Deeming Rule (and thus the PMTA process) would impose on such manufacturers, FDA certified that the Final PMTA Rule would have no significant impact on a substantial number of small entities. FDA claimed that this was the case because all costs associated with preparing and submitting a PMTA were attributable exclusively to the Deeming Rule and thus accounted for in the Deeming Rule RIA.

119.    Like the certification in *North Carolina Fisheries Ass'n v. Daley*, FDA's certification includes a statement—that the Final PMTA Rule would generate net benefits or negligible net costs for most affected small entities—but not a factual basis for that statement. By claiming that all costs associated with the PMTAs resulted from the Deeming Rule and not the Final PMTA Rule itself, FDA elided an explanation of the actual effects of the Deeming Rule's particular requirements.

120.    In summary, although FDA admitted in its Deeming Rule RIA that the agency could not estimate the costs of rules that had not yet been promulgated, including those governing PMTA requirements, when it later issued the Final PMTA Rule, FDA relied on and cited the regulatory impact analysis performed years earlier, before any proposed PMTA rule was even developed.

121.    And, as the multiple contradictions between FDA's statements in its Deeming Rule RIA and Final PMTA Rule RIA underscore, the added costs of the specific investigation requirements set forth in the Final PMTA Rule are significant and have driven many small businesses out of the market.

122.    FDA admitted in the Deeming Rule RIA that it could not provide a reliable estimate of the number of small manufacturers that would exit the market, but when it issued the Final PMTA Rule, FDA ignored this impact, considering only the regulatory costs to firms that filed a PMTA.

123.    The Regulatory Flexibility Act thus required FDA to prepare and publish a full regulatory flexibility analysis in conjunction with the agency's adoption of the Final PMTA Rule that evaluated and explained, *inter alia*, the steps FDA took to minimize the economic impact on small entities, including an evaluation of other significant alternatives to the Final PMTA Rule. 5 U.S.C. § 604(a).

124.    By failing to prepare and publish such a full regulatory flexibility analysis, FDA violated the Regulatory Flexibility Act.

125.    FDA's certification that the Final PMTA Rule would generate net benefits or negligible net costs for most affected small entities was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

126.    The Final PMTA Rule has had a significant impact on a substantial number of small entities, preventing many from applying or from applying for the full scope of tobacco products for which they would otherwise apply and limiting their ability to submit applications that comply with the regulations and requirements imposed by the Final PMTA Rule. FDA could have regulated premarket tobacco applications submitted by small entities in another manner, and its certification unreasonably ignored the economic impact of the choices it made in developing the Final PMTA Rule.

REDACTED

128.    Enorama's RTF letter constitutes final agency action for purposes of judicial review under the Regulatory Flexibility Act.

129.    Plaintiff thus seeks a declaration that FDA adopted the Final PMTA Rule in violation of the Regulatory Flexibility Act, an order vacating the Final PMTA Rule until FDA complies with its obligations under the Regulatory Flexibility Act, and an order setting aside and vacating FDA's Refuse to File letter issued to Enorama for its alleged failure to comply with the Final PMTA Rule.

130.    Because Plaintiff will also suffer immediate, irreparable harm absent injunctive relief, Plaintiff also requests temporary and preliminary injunctions staying the RTF letter.

## COUNT II
### Administrative Procedure Act

131.    Plaintiff incorporate by reference each of the preceding paragraphs as if fully set forth herein.

132.    Under the Administrative Procedure Act, a "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review." 5 U.S.C. § 704.

133.    The APA requires a court to "hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2).

134.    A court's APA "review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (cleaned up).

135.    FDA's RTF letter is subject to judicial review under the APA because it is a "final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704; *see, e.g.*, *Braeburn v. FDA*, 389 F. Supp. 3d 1 (D.D.C. 2019) (setting aside "FDA Letter Decision" under the APA).

a.    FDA's RTF letter is "final agency action" because it is a final determination by the agency that Enorama's PMTAs are not eligible for substantive review.  *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (stating a "final agency action" is one that "marks the consummation of the agency's decision-making process" and that is not "tentative or interlocutory in nature") (cleaned up); *see also, e.g.*, 21 C.F.R. § 1114.29(b).

b.    FDA's RTF letter is "final agency action" also because it disqualifies the products at issue from FDA's enforcement discretion for non-tobacco nicotine pouch products with timely-filed PMTAs undergoing any stage of FDA review.  *See Bennett*, 520 U.S. at 178 (stating that a "final agency action" is "one by which rights or obligations have been determined or from which legal consequences will flow") (cleaned up).

136.    The RTF letter injures Enorama in that it denies Enorama the substantive review of its PMTAs to which Enorama is entitled.

137.    The RTF letter also injures Plaintiff in that it disqualifies the products at issue from FDA's enforcement discretion for non-tobacco nicotine pouch products with timely-filed PMTAs undergoing any stage of FDA review.

138.    The relief Plaintiff requests in this Complaint would redress Plaintiff's injuries in two ways:

a.    It would eventually result in Enorama obtaining substantive review of its PMTAs; and

b.    It would render the products sold by Plaintiff eligible for FDA's enforcement discretion for non-tobacco nicotine pouch products with timely-filed PMTAs undergoing any stage of FDA review.

139.    The RTF letter is premised on an alleged failure to comply with requirements of the Final PMTA Rule.

140.    The RTF letter is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law because FDA's certification that the Final PMTA Rule would have no significant impact on a substantial number of small entities was arbitrary and capricious for the reasons explained above.

141.    FDA's Final PMTA Rule—and the RTF letter that relies thereon—is also arbitrary and capricious because it imposes extensive, costly, and uniform "investigation" requirements on *all* new tobacco products regardless of the morbidity and mortality profile of those products in contravention of Congress's intent when it established the "appropriate for the protection of the public health" standard for authorizing marketing of new tobacco products.

142.    FDA's Final PMTA Rule—and the RTF letter that relies thereon—is also arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law because FDA's Final PMTA Rule fails to specify any objective criteria for FDA to apply to determine whether marketing a new tobacco product is "appropriate for the protection of the public health."

143.    "Appropriate for the protection of the public health" is not defined in the TCA. However, all undefined statutory terms "do—in fact must—have a single, best meaning" that is "fixed at the time of enactment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

144.    The best meaning of the term "appropriate for the protection of the public health" is that the new tobacco product will contribute to a net decrease in serious tobacco-related disease and death in the U.S. population as a whole.

145.    Although oral nicotine pouch products, like Enorama's NIC-S, contain no harmful or potentially harmful constituents other than nicotine, no carcinogens, and food grade ingredients, and Defendants' own studies show they are not popular among youth,[12] the Final PMTA Rule subjects them to many of the same "investigation" requirements as a wide range of combustible, carcinogenic, and/or inhaled tobacco products, including cigarettes, smokeless tobacco, and ENDS. Among these requirements is the requirement for a clinical study on the nicotine pharmacokinetics of the products.

146.    FDA had authority to interpret, explain, and implement the generic PMTA requirements set forth in the TCA in a variety of ways, but chose to interpret the statutory "investigation" requirements in a uniform manner that imposes unduly burdensome clinical study requirements on manufacturers of novel, non-combusted, and non-inhaled products like oral nicotine pouches that are at the far low end of the tobacco product continuum of risk.

147.    Given Congress's stated intent in the TCA to reduce the morbidity and mortality associated with smoking and use of traditional tobacco products and the "best meaning" of the statutory term "appropriate for the protection of the public health," FDA's interpretation of the TCA's "investigations" language in the Final Deeming Rule as imposing uniform study

---

[12] The CDC's 2024 National Youth Tobacco Survey found that only 1.8% of middle and high school youth had used nicotine pouches in the last 30 days, and that 70% of that 1.8% used the products less than 20 out of the last 30 days, suggesting a lack of dependency for most users. FDA, Results from the Annual National Youth Tobacco Survey (Jan. 22, 2025), https://www.fda.gov/tobacco-products/youth-and-tobacco/results-annual-national-youth-tobacco-survey-nyts.

requirements regardless of a new tobacco product's risk profile is arbitrary, capricious, and an abuse of discretion.

REDACTED

150.    The RTF letter is arbitrary and capricious because, by refusing to file Enorama's PMTA, FDA treated Enorama differently than other applicants.

151.    Plaintiffs thus seek a declaration that the FDA adopted the Final PMTA Rule in violation of the Administrative Procedure Act, an order setting aside and vacating the Final PMTA Rule, and an order setting aside and vacating FDA's Refuse to File letter issued to Enorama for its alleged failure to comply with the Final PMTA Rule.

152.    Because Plaintiff will also suffer immediate, irreparable harm absent injunctive relief, Plaintiff also requests temporary and preliminary injunctions staying the RTF letter.

**REQUEST FOR RELIEF**

153.    Plaintiff respectfully requests that this Court enter judgment in its favor that includes the following relief:

a.     A declaration pursuant to 28 U.S.C. § 2201 that FDA's Regulatory Flexibility Act certification in the Final PMTA Rule RIA violated the Regulatory Flexibility Act;

b.     A declaration pursuant to 28 U.S.C. § 2201 that the Final PMTA Rule violated the Administrative Procedure Act;

c.     A setting aside, vacatur, and remand to FDA of the Final PMTA Rule and of the RIA associated therewith as arbitrary, capricious, an abuse of discretion and/or contrary to law;

d.     A temporary, preliminary, and permanent injunction pursuant to 5 U.S.C. § 611(4)(B) against enforcement of the Final PMTA Rule;

e.     A declaration pursuant to 28 U.S.C. § 2201 that the RTF letter issued by FDA to Enorama is arbitrary, capricious, an abuse of discretion, and contrary to law;

f.     A  setting aside, vacatur, and remand to FDA of the RTF letter issued by FDA to Enorama;

g.     A temporary and preliminary injunction staying the RTF letter;

h.     An order awarding Plaintiff its costs, expenses, and fees (including attorney fees) pursuant to 28 U.S.C. § 2412; and

i.     An order granting such other and further relief as is necessary and appropriate.

Respectfully submitted,

THOMPSON HINE LLP

Dated: February 17, 2026

By: _____/s/  Eric N. Heyer_____
Eric N. Heyer
James C. Fraser
Joseph A. Smith
THOMPSON HINE LLP
1919 M Street, N.W. Suite 700
Washington, D.C. 20036
Phone: 202.331.8800
Fax: 202.331.8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com
Joe.Smith@ThompsonHine.com

*Counsel for Plaintiff Enorama Pharma, Inc.*

## **VERIFICATION**

Bengt Jönsson, being first duly cautioned and sworn, deposes and states, based on his personal knowledge and records generated, kept, and maintained in the ordinary course of business of Plaintiff Enorama Pharma Inc., that the allegations contained in the Verified Complaint are true and correct.



Bengt Jönsson
Chief Executive Officer
Enorama Pharma Inc.